## Noel *et al.* *versus* White *et al.*

1. A judge, like a chancellor, may inform his conscience by referring facts, out of which an equity is. alleged to spring, to a ury to judge of the sufficiency of the proof, if, in his opinion, there is evidence of facts which, if made out, would establish the equity, though not sufficient to satisfy his mind in the first instance.

2. Where there was evidence, that one, acting as the agent and friend of a widow and family, to perfect their title to land; became aware of a defect in it, and purchased the outstanding title in another, it was not error to submit to the jury, to find whether he stood in such a relation of trust and confidence to them, as to make his purchase enure to their benefit.

ERROR to the Common Pleas of *Cambria county*.

This was an action of ejectment brought by A. M. White, Cornelius Boyle, Ellen Kennedy, Niel O'Donnel and Mary his wife, and Alexander McCahan and Mary his wife against Blasius Noel, Bartly Sutton, James Cunningham, Michael Weakland, and Miles Edmiston, for a tract of land in Carrol township, Cambria county, containing three hundred and eleven acres.

The land in controversy was surveyed September 28th 1773, in the name of Catharine Ann Reading, on an application dated April 20th 1769, and from her descended to the vendors of defendants.

The plaintiffs represented Edward Boyle, who on the 14th of July 1821, purchased the land from one John A. L. Houston, by articles of agreement, for $622, of which $100 was to be in cash, $128.84 in an order on the Chambersburg and Bedford Turnpike Company, and the balance in two annual payments, with interest. Boyle paid about two-thirds of the purchase-money, and in the fall of 1821 entered upon the land, commenced clearing and making preparations to build a house, into which, in the following spring, he moved with his family.   In 1823, he with his wife went to seek employment on the public works at Lebanon; leaving his family upon the land.   In the fall of the same year she returned, reporting his death, and with her children or some of them continued to reside on it, extending the improvements which Edward Boyle had commenced, until 1843, when her son Hugh, who had become deranged, drove her and the family away, and soon after left himself.

From 1821 to 1843 the possession commenced by Edward Boyle was continued by his wife and children without interruption.   In 1853 the defendants, who claimed under a deed from Edward Shoemaker, the vendee of Isaac, Catharine, and Mary Lum, to whom the land had descended from Catharine Ann Reading, finding it unoccupied, entered into possession; and

[Noel *et al. v.* White *et al.*]

during the following year, to wit, to December Term 1854, this ejectment was brought.

There was no evidence of title to the survey in John A. L. Houston, when he sold to Edward Boyle, nor that he had any authority from the owners to sell. The plaintiffs did not rest their claim upon their ancestor's contract with Houston, but offered and relied on it only to show the character of Boyle's entry on the land, and that it was done under colour of title.

On the trial they proved by Judge Canan, that he wrote the agreement between Houston and Boyle, to which was appended Houston's receipt dated July 14th 1821, for $200, and for the order on the turnpike company. That on the 11th of November 1842, he received the following letter from Edward Shoemaker :—

Moses Canan, Esq.,

Dear Sir :—The bearer of this, Mr. P. Ivory, will call on you for the purpose of obtaining some information respecting the land you once sold, as the property of a Mr. Houston, to Boyle.

It is supposed the Nicholson surveys, which are offered for sale, will cover this land, and it is with a view of protecting Boyle that Mr. Ivory is acting. If Boyle can connect himself with the Houston title in any way it will answer the purpose. If he cannot, it will be well to claim the land as Houston's. Satisfy the Nicholson commissioner of the priority of claim, and they will then abandon it. Any service you can render Mr. Ivory in this matter will be a favour to Boyle.

> Very respectfully and truly yours.

Nov. 8, 1842.

That he wrote to Mr. Shoemaker stating that he sent him the key to his paper case, and that he might look for the papers himself; that he had seen them several times before that, did not know that he had left them in his case, but could not find them afterwards, and that Shoemaker had told him that he did not find them. That he received another letter from Mr. Shoemaker in 1849, of which the following is a copy :—

> Ebensburg, 28th April 1849.

Moses Canan, Esq.,

Dear Sir :—You once mentioned to me that, as the agent of a Mr. Houston, you sold the tract of land surveyed in the name of Catharine Ann Reading, to a man named Boyle, and that Houston and Boyle both died before the contract was completed. The widow of Boyle is very anxious by some means to obtain a title to the land, and has spoken to me very frequently to ascertain for her how she can effect it. Will you have the goodness to give me such information for the old lady as you can, informing me whether all the title papers are in your hands,

[Noel *et al. v.* White *et al.*]

and if so, whether they are all perfect, as regards warrant, survey, and patent, and any advice or instruction that you can give that will facilitate her object.

Very truly and respectfully yours,

EDWARD SHOEMAKER.

On the agreement between Houston and Boyle there was the following assignment endorsed:—

" I assign all my right, title, interest, and claim in the within article of agreement to Edward Shoemaker, for the sum of seventy-five dollars. Witness my hand and seal the 14th day of November, A. D. 1852.

" Witness present,          ELLINOR BOYLE."

JACOB LUTHER."

There was an effort made to show, that this assignment of Mrs. Boyle was procured by fraud, that she was old and imbecile; but the evidence on this point was not very satisfactory. She was old and poor, a charge on the township, but the consideration paid for it compared with what she could legally claim out of the land was ample, and it was proved that though at first unwilling to sign, yet when she did so, she had a clear understanding of the effects and consequences of her actions. The main questions in the case were:

1. Whether the plaintiffs were entitled to recover under the Statute of Limitations?

2. Whether the evidence raised a resulting trust in favour of plaintiffs, so as to affect the defendant's title?

3. Whether the possession of Shoemaker or his vendee was obtained under such circumstances as to entitle the plaintiffs to possession, without regard to any question of title?

The parties presented the following points to the court below, on which instruction to the jury was requested:—

*Plaintiffs' Points.*—1. That possession, taken under colour of title and continued for twenty-one years, confers an indefeasible title to all land claimed at the time of such entry, and is equally good to recover possession of such land, as to defend the possession.

2. That the assessment of 212 acres of the Catharine Ann Reading tract, is not conclusive evidence that the Boyle family had abandoned their claim to that portion of the land. If the jury believe that, notwithstanding such assessment, the family claimed the land and occupied it as theretofore, the act of Hugh Boyle in returning the 212 acres as unseated (if he did so), could not divest the title of his brother and sister in any part of the tract of land claimed.

3. That if the jury believe that Hugh Boyle made return of the 212 acres as unseated, and that when he did so, that he was

of unsound mind, such return will not divest the title of the plaintiffs to any part of the land claimed.

4. That if the jury believe that Edward Shoemaker, by professing friendship for the Boyle family, and undertaking as their agent, or friend, to procure the title for them, acquired a knowledge of the defect in their title, he cannot take advantage of such knowledge for his own benefit; but any title that he acquired will enure for their benefit; and all that he is entitled to is the money that he paid to acquire such title, and the interest thereon. And all who claim under him, with knowledge of the Boyles' claim, are in the same situation.

5. That if the jury believe that Edward Shoemaker took an assignment of the claim of Edward Boyle to this tract of land, for the purpose of obtaining the possession, and that he and Noel, to whom he sold, did take possession under it, that the defendants coming in under it must surrender the possession in this action to the plaintiffs; and, if defendants have any title, they must recover under it in a subsequent action.

*Defendants' Point* was: If the jury believe that, in 1838, 1839, or 1840, the occupants of the land in dispute refused to return the tract in dispute to the assessor for the amount contained in the survey, but returned 100 acres, and directed the residue, 212 acres, to be assessed on the unseated list, without designating any boundary to the 100 acres that were returned on the seated list, the plaintiffs can only recover the quantity of land cleared and occupied for twenty-one years before defendants got possession.

The court (TAYLOR, P. J.), after stating the main facts of the case, charged the jury as follows:—

" We proceed to examine these several grounds of claim, reversing the order in which they have been stated and discussed.

" 1. Was the *possession* of this land *obtained* by the defendants, by such means, or in such manner, that the plaintiffs are entitled to have it restored without further inquiry ?

" It is undoubtedly the law that if one get into the possession of another by force or fraud, it shall be restored irrespective of any question of title. The plaintiffs here allege, that Edward Shoemaker and the defendants entering under him, obtained their possession surreptitiously, by taking, on the 12th November, 1852, an assignment of Eleanor Boyle's interest in the agreement with Houston. But, assuming her to have been then in possession, or to have had control of the possession at that time, is there any evidence of *fraud* practised by Mr. Shoemaker ? This was all done, as fully explained by Mr. Hobble, at the instance and through the agency of the overseers of the poor. The very witness, moreover, called to show that she was at the time imbecile, and imposed upon, testified, on the contrary, that she was well, seemed to understand what she was doing, and acted volun-

[Noel *et al. v.* White *et al.*]

tarily. And the consideration agreed upon was actually paid, and applied to her support by the overseers, as it was understood and contemplated at the time should be done. Nor, as she could only claim dower, and was a very old woman, and the property in such a condition that Hobble could make nothing out of it, could the consideration be alleged to be inadequate. For the time she afterwards lived, it was *double* what she had received from the tenant when the place was in a condition that it could be farmed. Why, then, as to this transaction, should Mr. Shoemaker or the defendants be charged with *fraud?* But what is decisive upon this point, and, as it respects this question, is, that neither she nor any of the Boyle family had any *possession.* There was no one upon the land. So far as the right of the Boyle family had not become fixed by the operation of the statute, (and to that extent this is an immaterial question) the owner of the survey had a perfect right to enter; and Mr. Shoemaker, at that time, and the defendants, by conveyance from him before they entered, had the legal title. There is, therefore, we instruct you, no evidence to support this general position of the plaintiffs as a ground of claim, or upon which there is any question to be submitted to the jury. And this is our answer to the *fifth* written point of the plaintiffs' counsel.

" 2. Is there evidence that Mr. Shoemaker, in 1852, took the conveyance of the title of the Catharine Ann Reading survey, under circumstances which rendered him a *trustee* for the plaintiffs?

"' A trustee, so far as the trust extends, can never be a purchaser of the property embraced under the trust, without the consent of all persons interested; and this principle embraces executors, administrators, guardians, attorneys-at-law, general and special agents, assignees, commissioners, sheriffs, and all persons, judicial or private, ministerial or controlling, who in any respect have a concern in the sale of property. It extends to sale by public auction, and judicial sales, as well as private ones; and applies to purchases direct and indirect, in person or through an agent, or by the medium of a person who subsequently reconveys to the trustees, and to purchases made by the trustee as agent for a third person, and to purchases in which he is to have a partial interest, as well as those in which he is exclusively concerned: 65 Law Lib. 138. The principle seems to be that ' no person can become a purchaser of an interest in property where he has a duty to perform which is inconsistent with the character of a purchaser; or, as it is stated by Judge Houston, in Rankin *v.* Porter, 7 Watts 370, that wherever confidence has been reposed, justice forbids that it should be abused; and it applies so strongly (he adds) to those who have gratuitously or officiously undertaken the management of another's property as

[Noel *et al. v.* White *et al.*]

those who are retained or appointed for that purpose, and paid for it.'

" This being the law, we assent to, and answer affirmatively the *fourth* point submitted by the counsel of the plaintiffs, viz.:

"' 4. That if the jury believe that Edward Shoemaker by professing friendship for the Boyle family, and undertaking, as their agent or friend, to procure the title for them, acquired a knowledge of the defect in their title, he cannot take advantage of such knowledge for his own benefit, but any title that he acquires will enure for their benefit; and all that he is entitled to is the money he paid to acquire such title, and the interest thereon; and all who claim under him are in no better situation.'

" There can be no doubt about the law. The only difficulty which we have had on this point, is, whether there is such evidence of the facts assumed or asserted as should be submitted to the consideration of the jury. The evidence should satisfactorily establish the trust relation, to give application to the legal principle invoked, particularly when, as in this case, the alleged violation of it imputes bad faith and a breach of confidence.

" As to what has been urged respecting the *price* paid by Mr. Shoemaker, and the inference claimed from that, viz. that the vendors wished to favour the Boyle family, Judge Kennedy says, in Sheriff *v.* Neal, 6 Watts 539 (cited by the plaintiffs), ' It does not appear that the circumstance of the purchaser getting a better pennyworth in the purchase of the land by his declaring to the vendor that he wished to buy for one whom the vendor was willing to favour, when in truth he was employed to purchase for another, has never been held a sufficient reason for refusing a decree of specific performance, and, certainly, never for setting the contract aside after it was fully executed, or *for decreeing the vendee a trustee for the person for whom he said he was buying the land.*' Here there is no evidence of anything that was said, or that took place when this purchase was made; and the only evidence of the trust relation, and the alleged violation of good faith, is contained in the two letters in evidence of Mr. Shoemaker to Judge Canan, and Judge Canan's testimony." The court here read and commented upon the letters and the testimony of Judge Canan, and continued:

" We leave it with you to judge whether the evidence satisfactorily establishes the agency of Mr. Shoemaker, and the breach of confidence or violation of good faith alleged by the plaintiffs in their point. If it does, the plaintiffs having brought into court the money paid by Mr. Shoemaker, with interest to this time, your verdict should be for them. But if it does not, then you will proceed to the consideration of the remaining ground of claim, to which the greater portion of the evidence here relates, and

[Noel *et al. v.* White *et al.*]

which, in that case, would become the turning question in the cause. And we proceed to the discussion of that question.

" III. Can the plaintiffs stand upon the statute of limitations ?

" One entering upon a tract of surveyed land, under colour of title to it, and continuing to reside upon and occupy it, claiming it as his own, for twenty-one years, acquires thereby title, not only to the part or parts he actually encloses, occupies, and cultivates, but to the whole tract. This is the law. And the title thus acquired is such as to enable him to hold, or to regain the possession, in case of a subsequent entry, even against the warrantee. And, in this connection, we answer affirmatively the first point submitted by the counsel for the plaintiffs.

" There can be no doubt, in point of fact, upon the evidence, that Edward Boyle, going upon the land in the fall of 1821, in pursuance of his contract with Houston, entered under colour of title ; or that he commenced his improvement, which was afterwards continued by his family, under a claim to the whole tract. The evidence would seem to show, also, that there was an occupancy to some limits without any material interruption until 1843. This, if it continued as it was commenced, an occupancy of the whole tract, or under a claim of the whole, gave title to the whole after twenty-one years. It is contended, however, that in 1838, '39, or '40, within twenty-one years from the commencement of the improvement, Mrs. Boyle and Hugh, the only members of the family then upon the land, had one hundred acres assessed as seated, and the balance of the tract was unseated, and thus and thence ceased to hold and claim the whole tract by its boundaries, but, on the contrary, relinquished their possession of all of it but one hundred acres. The fact here asserted is proven by the assessors and the assessment. And the defendant's counsel, in a written point submitted, ask the court to instruct you that if you 'believe that in 1838, 1839, or 1840, the occupants of the land in dispute refused to return the land in dispute to the assessor for the amount contained in the survey, but returned 100 acres, and directed the residue, 212 acres, to be assessed on the unseated list, without designating any boundary to the 100 acres that were returned on the seated list, the plaintiffs can only recover the quantity of land cleared and occupied for 21 years before the defendants got possession." The plaintiffs, in their second point, ask us to instruct you that the act of Hugh, in view of the facts here asserted, ' could not divest the title of his brother and sisters in any part of the tract claimed ;' and in their third point, that such act should have no effect to divest the title of any of the plaintiffs, if the jury believe that Hugh was at the time 'of unsound mind.' Any rights which any of the plaintiffs may claim under the statute of limitations, result from the acts

[Noel *et al. v.* White *et al.*]

of the member or members of the family in possession. Occupancy by one would avail all; but if the one having the possession, deserted or circumscribed it, the rights of all were affected by his act: and if it amounted to an interruption of the occupancy of the tract, or a part of the tract, the fatal result is not cured or averted by any reason which may be assigned for it. We answer the point of the defendants' counsel, therefore, in the affirmative; and the *second* and *third* points of the plaintiffs in the negative. And we instruct you, that if you find the facts asserted in the defendants' point as proven by the assessor and corroborated by the assessment, your verdict, as it respects this question, should be for the defendants, in the absence of any evidence designating, so as to enable you to find any part of the land as held in actual occupancy for twenty-one years.

"Having thus discussed the whole case, and answered in the course of the discussion all the points put by the counsel of the parties, it remains only to remind you that the cause is submitted to you upon two questions:

"1. Does the evidence satisfactorily establish the trust relation asserted in the plaintiffs' fourth point? If it does, they are entitled to your verdict; otherwise, the decision must turn upon the question last discussed. And upon that part of the case, we have only to repeat, that if you find the facts as asserted in the defendants' point, your verdict should be in their favour.

"To which charge and opinion of the court the counsel of the plaintiffs and of the defendants except, and pray that the same may be reduced to writing and filed of record, which is accordingly done, and bills of exception signed and sealed."

The jury found in favour of plaintiffs, and judgment having been entered thereon the defendant sued out this writ, assigning here for error the following matters, viz.:

1. The court erred in answering plaintiffs' fourth point in the affirmative.

2. The court erred in submitting the question of the trust relation of Edward Shoemaker, as a question of fact, to the jury, under the evidence in the case.

3. The court erred in that portion of their charge, in which they say, "We instruct you, that if you find the facts asserted in the defendants' point, as proved by the assessors, and corroborated by the assessments, your verdict should be for the defendants." The court should have given peremptory instructions to the jury that the conduct of plaintiffs, *as proved*, suspended the running of the Statute of Limitations.

4. The court erred in not instructing the jury that the defendants, having no notice of the trust, were not affected by it, and occupied the position of innocent purchasers.

[Noel *et al. v.* White *et al.*]

*John Scott* and *R. L. Johnson,* for plaintiffs in error.—The first and second assignments of error may be treated together. The whole evidence on the subject of a trust, when taken together, was entirely too vague and uncertain to be submitted to a jury. The learned judge, in his charge, admits that a strong doubt exists in his mind as to the propriety of submitting the evidence to the jury; and had the case of McBarron *v.* Glass, 6 Casey 134, been before his Honour, the case would have been clear of difficulty. But the court, while clearly indicating to the jury their opinion, that the evidence failed to establish the trust, submitted it to them *as a fact,* in which there was clearly an error. McBarron *v.* Glass decides, that in order to establish a resulting trust against a legal title, it is the duty of a court to reject all evidence which, "in the judgment of the *court,* when taken as true, does not make out such a case as would induce a chancellor to decree a conveyance." The application of this principle to the case now before the court, establishes manifest error. For the same principle see Brawdy *v.* Brawdy, 7 Barr 157; Poorman *v.* Kilgore, 2 Casey 371; see also Irvin *v.* Shoemaker, 8 W. & S. 76; Stine *v.* Shirk, 1 W. & S. 195.

The propriety of withdrawing a case of this character from the jury, is freely indicated in the opinion of C. J. Lowrie, in De France *v.* De France, 10 Casey 389.

The acts of the Boyles were clearly such as to entitle the defendants below to peremptory instructions, as to their effect upon the running of the Statute of Limitations.

"No appropriator of land is suffered to escape from a false position once taken by him in relation to the revenue." "The principle is of general application and founded not more in policy than in justice:" Clarke *v.* Dougan, 2 Jones 91. To the same point is Stephens *v.* Leach, 7 Harris 265; Hockenbery *v.* Snyder, 2 W. & S. 252; Barnhart *v.* Pettit, 10 Harris 139; St. Clair *v.* Shall, 8 Id. 110.

Even if it were proper to submit the question of the resulting trust to the jury upon the evidence in the case, the defendants could not be affected by it unless clear, positive, and direct notice of that trust, or of the facts from which it was claimed to result, was brought home to them: Scott *v.* McCormick, 14 S. & R. 333; Fillman *v.* Divers, 7 Casey 430; Kellum *v.* Smith, 9 Casey 158.

*Whites & Coffey,* for defendants in error.—There was no error in submitting the facts referred to in the first and second assignments of error to the jury, for without this, or without overruling on the province of the jury, the court could not say how the fact was: Fillman *v.* Divers, 7 Casey 429; Baltimore and Ohio Rail-

[*Noel et al. v. White et al.*]

road Co. *v.* Hoge, 10 Casey 222; Myers *v.* Hart, 10 Watts 107; 1 Wh. and Ind. Eq. Cases 57; Rankin *v.* Porter, 7 Watts 387; Galbreath *v.* Elder, 8 Watts 81, 94, 100; Cleavinger *v.* Reiman, 3 W. & S. 497, 493; Hackenbury *v.* Carlisle, 5 W. & S. 348, 350.

Shoemaker found the title defective, and bought one that was outstanding.

The letters of Shoemaker, and the other testimony on this point, made out a clear case of agency, not at all in conflict with McBarron *v.* Glass, 6 Casey 134, and De France *v.* De France, 10 Casey 389.

As regards notice to defendants of the claim of Boyle, no point was made nor instruction asked in the court below, and therefore this court will not reverse: Storch *v.* Carr, 4 Casey 135. The presumption is, that no question was submitted to the jury without evidence to support it.

The opinion of the court was delivered, January 7th 1861, by

STRONG, J.—The first and second assignments aver that the court erred in submitting to the jury to find whether Edward Shoemaker stood in such a relation of trust and confidence to the Boyle family, as to make a purchase of the land in his own name enure to their benefit. It is not denied that the law is as laid down by the learned judge, "that if Shoemaker, by professing friendship for the Boyle family, and undertaking as their agent or friend to procure the title for them, acquired a knowledge of the defect in their title, he cannot take advantage of such knowledge for his own benefit, but any title which he acquires will enure for their benefit." But it is insisted that there was no sufficient evidence of such a confidential relation, to warrant the court in submitting to the jury the question whether it existed. It is true that a jury is not to be permitted to find a fact without evidence of it, and when the fact is one out of which an equity is alleged to spring, the court as well as the jury is, in some measure, to judge of the sufficiency of the proof. But if there be evidence of a fact, though not sufficient in the first instance to satisfy the mind of a chancellor, he may submit it to the jury, and inform his conscience by their finding. What was said in McBarron *v.* Glass, 6 Casey 133, was not new. It was the doctrine of former decisions to which it referred, and it was in entire harmony with what we now say. Let it be that, in cases where one party asserts an equitable right to a conveyance, it is the duty of a judge to reject the evidence offered, if in his opinion, when taken as true, it does not make out such a case (that is such an equity) as would induce a chancellor to decree a conveyance: still the opinion of the jury may be taken upon the question whether the evidence does prove the

facts from which a sufficient equity springs. If the fact, when proved, is insufficient, then the evidence of it should be withheld; but if the inquiry be whether it is proved, and there be evidence of it, it may be submitted to the jury.

Then was there evidence in this case that Shoemaker was the agent of, or stood in a confidential relation to, the Boyle family? We think there was; not perhaps very full and satisfactory, not enough to dispel doubts from the mind of the learned judge who tried the cause, but enough to warrant his calling in the assistance of the jury to enlighten his conscience.

The Boyle family, consisting of the mother, a widow, and her children by Edward Boyle, deceased, claimed the land under a colourable conveyance made to the father in 1821, possession taken by him under it, an improvement commenced, and followed up after his decease, by the widow and children for about twenty years. It was purchased by the father from John A. L. Houston, through Moses Canan, the agent of the vendor. On the 8th of November 1842, while the Boyles were in possession, Shoemaker wrote a letter to Moses Canan, commending to him a certain P. Ivory, the bearer of the letter, as a person who would call for information respecting the land sold by him as the property of a Mr. Houston, to Boyle. In this letter Mr. Shoemaker stated that Ivory was acting with a view to protect Boyle against the Nicholson surveys, and added that any service rendered to him would be a favour to Boyle. It is clear that in writing this letter Mr. Shoemaker was professedly acting as the friend of the Boyle family, with a view to protecting their title. It is hardly consistent for him, or for any claiming under him, now to say that he was not. Whether his agency was at their instance or of his own motion, is of little consequence. The letter forms intrinsic evidence that it was with their consent. In answer to it Mr. Canan sent to Shoemaker the key to his paper-case, in which the deed prepared by Houston for Boyle had been deposited, and gave him permission to search there for the papers relating to the title. Whether he found them or not, does not appear positively. He said afterwards, on one occasion, that he did not, but Mr. Canan was not able afterwards to find them. At all events he obtained an opportunity to search for them in the place where some of them, if not all, had been kept, and he obtained this opportunity by professing to act with a view to protect the Boyle title. On the 28th of April 1849, he again wrote to Mr. Canan a very remarkable letter, and incomprehensible, if he was not then acting as an agent for Mrs. Boyle. And if for her, then he was equally so for her children, for she was a co-tenant with them, and an acquisition of title by her must have enured for their benefit: Weaver *v.* Wible, 1 Casey·

[Noel *et al. v.* White *et al.*]

270; Lloyd *v.* Lynch, 4 Casey 419. In this second letter, he refers to the land as having been sold by Canan for Houston, to Boyle, who died, as he alleges, before the contract was completed. He declares that the widow is anxious, by some means, to obtain a title to it, and that she has very frequently spoken to him to ascertain for her how she can effect it. He asks information for her, inquires after the title-papers, and requests any advice or instruction that will facilitate her object. Surely this letter, in connection with the former, and with the fact that he had obtained the key of the depository where the title-papers had been, was some evidence of his having stood in a relation of trust and confidence to the widow and heirs of Edward Boyle. And it would be no far-fetched presumption that he had obtained through that relationship a knowledge of the defect in their title, before he bought the outstanding right of Lum and others.

There is nothing in the third assignment of error. The answer of the court to the defendants' point was a full affirmance of it, and they cannot complain that the court did not say more than was requested.

The fourth assignment was abandoned on the argument.

We do not feel at liberty to express an opinion respecting the other question presented to us by the defendants in error. It is not raised by the record, and our opinion therefore would be extrajudicial.

The judgment is affirmed.